**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-CR-43 (TNM)** |
| | : | |
| **CARLOS GIOVANI LINARES BOTEO,** | : | |
| **a.k.a. "Tiny"** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing.  For the reasons herein, the United States requests that the Court sentence Defendant Carlos Giovani Linares Boeto (hereinafter, "the defendant" or "Defendant Boteo") to a period of 240 months' incarceration on the count of conviction.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

On February 9, 2023, a federal grand jury empaneled in the District of Columbia returned an eleven-count Indictment against twelve members of the transnational criminal street gang known as 18th Street, charging them with participating in a years' long racketeering conspiracy involving two separate cliques[1] operating in and around the D.C.-metro area.  At the center of the Indictment's charges were two separate murders – one of Victim # 6, Carlos Ramos Martinez, a.k.a., "Fire" and the other of Victim # 8, Danis Alcides Salgado Mata, a.k.a., "Caballo," – perpetrated by the gang in furtherance of the conspiracy's objectives.  Defendant Boteo was charged in connection with the overall racketeering conspiracy in Count 1, that is, Conspiring to

---

[1] As specified in the Indictment, members of 18th Street are organized into "cliques," or smaller groups operating within  specific cities or regions that all operate under the umbrella rules of 18th Street. Additionally, there are two larger factions of 18th Street consisting of multiple smaller cliques: The Surenos and the Revolucionarios.

Participate in a Racketeer Influenced and Corrupt Organization ("RICO Conspiracy"), in violation of 18 U.S.C. § 1962(d)[2], as well in connection with the kidnapping and murder of "Fire," in Count 2, Conspiracy to Commit Violent Crime in Aid of Racketeering-Murder, in violation of 18 USC § 1959(a)(5), Count 3, Violent Crime in Aid of Racketeering-Assault With a Dangerous Weapon, in violation of 18 USC §§ 1959(a)(3), and Count 4, Conspiracy to Commit Kidnapping Resulting in Death, in violation of 18 USC § 1201(c).   On February 13, 2024, a grand jury in D.C. returned a Superseding Indictment against a select number of the original defendants, charging them with new offenses based on the same underlying conduct.   The grand jury charged Defendant Boteo again with RICO Conspiracy in Count 1[3] and with Conspiracy to Commit Kidnapping Resulting in Death in Count 3.

Shortly before the return of the Superseding Indictment, the defendant notified the government that he intended to enter a plea of guilty to Count 1 pursuant to a written plea agreement with the United States, in which, among other things, the government agreed to dismiss Count 3 at the defendant's sentencing.  *See* ECF No. 139.   On April 19, 2024, the defendant then formally entered his plea of guilty as to Count 1 of the Superseding Indictment.   In support of the plea, the United States and the defendant offered the following factual proffer:

> Between on or about February 29, 2020, through July 14, 2021, the defendant Carlos Linares Boteo (hereinafter "Boteo") was a member or associate of the international criminal street gang known as "18th Street."   The 18th Street gang engages in a variety of criminal activities to include acts of assault, robbery, kidnapping, murder, and firearms trafficking in the District of Columbia and other jurisdictions, both within the United States and in foreign countries. 18th Street members are required to commit acts of violence to further the interests of the gang.   These violent acts are often directed against rival gang members, 18th Street members who have violated gang rules or have otherwise disrespected the gang, and people who are suspected of cooperating with law enforcement. Additionally, 18th Street members are also known to possess, sell and transport narcotics,

---

[2] In the original Indictment returned by the grand jury in February 2023, Defendant Boteo was also included in the Special Sentencing Factor for Count 1 for his participation in the murder of Victim # 6.

[3] In the Superseding Indictment, Boteo was not included in the Special Sentencing Factor for Count 1.

weapons, and other contraband to generate money to support the gang and its criminal activities both within the District of Columbia and across state lines. Some of the proceeds of this criminal activity are wired to members of the gang's leadership in foreign countries. 18th Street members are known to control geographical areas and use violence to maintain their control. 18th Street consists of an enterprise that engages in racketeering activity.

*Sterling, VA Robbery*

On February 29, 2020, Defendant Boteo and other 18th Street gang members, both named and unnamed in the superseding indictment, were at the Tipicos Los Amigos restaurant located at 46950 Community Plaza #125, Sterling, VA. Upon exiting the restaurant, surveillance footage captured members of the group flashing 18th Street gang hand signs. Defendant Boteo and the rest of the group then walked across the parking lot of the plaza in which the restaurant was located and entered First Break Sports Bar located at 46970 Community Plaza #200, Sterling, VA. Shortly thereafter, Defendant Boteo and the other members of the group exited the sports bar and approached victims W.S. and P.L. who were standing on the corner of the shopping plaza. Defendant Boteo and the other members of his group surrounded the victims and physically separated them. Members of Defendant Boteo's group identified themselves as 18th Street gang members and demanded victim P.L.'s money. When P.L. refused, both he and victim W.S. were violently assaulted by multiple members of the 18th Street group. During the course of the assault, members of the 18th Street group stole W.S.'s bookbag and hat, and then fled the scene. Both W.S. and P.L. suffered injuries as a result of the assaults and robbery. Defendant Boteo was captured on surveillance footage participating in the assaults and robbery.

*Murder of Carlos Ramos Martinez a/k/a "Fire"*

On or about July 12, 2021, 18th Street members named and unnamed in the superseding indictment met in College Park, MD to discuss the idea of an 18th Street member switching from the Los Crazy Brothers ("LCB") clique to the Tiny Locos Surenos ("TLS") clique. At the meeting, other internal gang issues were discussed to include issues that the LCB members had with victim Carlos Ramos Martinez (hereinafter "Martinez") a/k/a "Fire" recruiting members away from the LCB clique. In addition, members had an issue with the fact that Martinez was a member of a rival faction within the 18th Street gang known as the Revolucionarios. In the midst of this meeting, an 18th Street member connected with Defendant Boteo via a jail call and explained to Boteo the "problem" with Martinez and identified him as a member of the Revolucionarios, stating that he "writes under another name." Defendant Boteo acknowledged this. The 18th Street member stated, "They told us they were dirty." Defendant Boteo acknowledged this. Defendant Boteo asked if the 18th Street member was told that from Guatemala, to which the 18th Street member responded no, that it was from some people who came up from El Salvador. The 18th Street member then stated, "If we have to give them that gentleman, we will do it." Defendant Boteo advised the 18th Street member to do it at once without thinking it through and figure it out how to do it successfully. Defendant Boteo stated, "You know better what to do to fix it. I have the police on top of me. They will screw me. I will call you today or tomorrow and we'll see what happens with that motherfucker. Call down there to see what the deal is." Defendant Boteo advised the 18th Street member on the importance of maintaining

order and keeping things running for the cause and the family's standing after people going to jail. He advised the 18th Street member, "You wear the Nikes. You just have to [makes noise] from the house. Even better with an old shoe to avoid detection. It sucks to burn a line. That's why you have to have an old phone."

On or about July 13, 2021, Defendant Boteo called the 18th Street member from jail. Defendant Boteo began the conversation by asking, "What's the fucking problem you were telling me yesterday?" The 18th Street member recounted a recent confrontation with Martinez. The 18th Street member told Defendant Boteo, "You have the last word on this. You decide what to do about this." Defendant Boteo explains that he would have given Martinez a beating right there and ordered other *locos* to beat Martinez, stating: "No compassion, brother. You must talk to them aggressively and hit them in the mouth if they talk back. You should have hit him on the mouth right that instant." The 18th Street member pointed out that another clique was present at the time. Defendant Boteo stated, "Right there, so the other clique could see what was going on. The 18th Street member subsequently stated, "You gave your decision. I will see to it." Defendant Boteo then went on to explain the importance of giving punishments on the spot to maintain order and respect.

Later that evening on or about July 13, 2021, members of the 18th Street gang named and unnamed in the superseding indictment to include the 18th Street member that had the prior phone calls with Defendant Boteo held a held a gang meeting at a location in Northwest Washington, DC led by a senior gang leader joining the meeting via FaceTime from El Salvador. At the meeting, all of the homeboys present, voted to remove Martinez from the Washington, DC area by means of seizing, confining, inveigling, enticing, decoying, kidnapping, abducting, concealing, or carrying away in part due to his membership in the Revolucionarios faction.

Following the vote, 18th Street members both named and unnamed in the superseding indictment began driving Martinez out of the DC area northbound on I-95. At some point in the early morning hours of July 14, 2021, the members stopped the car alongside I-95 between mile markers 103.3 and 103.4. Soon after, a construction van driven arrived as well and stopped alongside I-95 between mile markers 103.3 and 103.4. Inside the construction van were additional 18th Street members who were armed with firearms. The construction van driven was later identified as belonging to a construction company where co-defendant Rolando Martinez-Mora, and other 18th Street members worked. According to the owner of the construction company, during the time period to include July 12, 2021, through July 14, 2021, the construction van was in the possession of co-defendant Bradley Andree Martinez-Mora (hereinafter "co-defendant Andree Martinez-Mora") and his brother ("co-defendant Carlos Rolando Martinez-Mora").

After the van was stopped alongside I-95, 18th Street members led Martinez into the woods where they murdered him by shooting him multiple times with firearms. Following the murder, 18th Street members destroyed the vehicle used to transport Martinez to Maryland by lighting it on fire near a state park in Delaware. The 18th Street members then returned to Maryland and informed other gang leadership about the murder of Martinez.

> During the time of the murder of Martinez, Defendant Boteo acted with at least with malice aforethought in his communications with the 18th Street member. In addition, at the time of the Sterling, VA robbery, and the murder of Martinez, Defendant Boteo was a member or associate of the 18th Street gang, and his purpose in the racketeering activity described above was to maintain or increase his position within the 18th Street gang.

*See* ECF No. 199. As the Statement of Offense makes clear, the above factual proffer is not intended to be an all-encompassing summation of the available evidence of Defendant Boteo's guilt as to Count 1, but rather a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. *See id.*

## II.    DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

### A.    Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). See *United States v. Gall*, 128 S. Ct. 586, 596 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

        (i) issued by the Sentencing Commission ...; and

        (ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –

    (A) issued by the Sentencing Commission ... and

    (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

B.    <u>Guidelines Calculations</u>

Turning to 3553(a)(4)(A), the government concurs with the assessment of the United States Probation Office for the District of Columbia (hereinafter, "U.S. Probation") regarding the total offense level applicable in this case, the defendant's criminal history score and the resulting range under the U.S. Sentencing Guidelines (hereinafter, "Guidelines" or "USSG").

1.    *Offense Level Calculation*

The government agrees that the Adjusted Offense Level for the count of conviction is 40. Under 2E1.1, given that the defendant has pled guilty to a violation of 18 U.S.C. § 1962(d), U.S. Probation must assess whether there is more than one underlying offense, and, if so, treat each underlying offense as though it were a separate count of conviction and apply the relevant grouping rules from Chapter Three of the Guidelines. *See* USSG § 2E1.1. Here, as U.S. Probation has correctly assessed, there were two such offenses underlying the defendant's conviction – the

Sterling, VA robbery of Wilfredo Lopez and Pedro Lopez in February 2020 and the kidnapping and murder of "Fire" in July 2021.

        a)        Sterling, VA Robbery

Beginning with the robbery in Sterling, Virginia (called "Group 1" in the PSR) in which Defendant Boteo participated, the government agrees that the relevant guideline for robbery is §2B1.3(a) and that the resulting base offense level is 20.  The government also agrees that because the victims suffered physical injuries as a result of the robbery, two levels should be added under USSG § 2B3.1(b)(3)(A).

Counsel for the defendant has disagreed with U.S. Probation's assessment, arguing that the two-level enhancement for physical injury only applies in situations where the ailment is one in which the individual would ordinarily seek medical attention and that the stipulated facts do not specify the type of injury nor can the defendant be seen inflicting the blow himself on video.  *See* ECF No. 247.  Counsel separately claims that her client is entitled to a four-level reduction for being a minimal participant in the offense.  *Id.*  Putting aside the fact that the offense level for this particular group will not control the defendant's overall offense level and have no role in his sentencing range under the Guidelines, counsel's arguments are without merit.  First, as the statement of offense itself makes clear, it is not intended to be a complete recitation on everything that happened to victims on February 29, 2020.  Second, the fact that the defendant is not seen on video inflicting a critical injury on either victim is of little value, since he can still be held responsible for the relevant conduct of his co-conspirators, including acts he aided and abetted as well as the acts of others that were within the scope of jointly undertaken criminal activity and in furtherance of that activity.  *See* USSG § 1B1.3.  Here, the evidence clearly demonstrates both that Defendant Boteo aided and abetted the conduct of his co-defendants and that the eventual assaults

that were committed to accomplish the robbery were plainly within the scope of the jointly undertaken activity. Defendant Boteo can be seen on camera following his fellow gang members to where the victims were standing, assisting them in separating the two, and then going off with Pedro Lopez where Pedro Lopez was beaten by gang members just barely within view of the camera, before returning to where co-defendant Bradley Martinez-Mora was standing and confronting Wilfredo Lopez while co-defendant Bradley Martinez-Mora punched him in the face multiple times. *See* Gov. Tr. Ex. E10, E11. As the record has established, both victims suffered noticeable, visible, injuries, *see* Gov. Tr. Exs. E14-16, E18-E21, and indeed Wilfredo Lopez sought treatment afterward at the clinic at his school after having lost his tooth during the gang robbery. *See* 4/17/2024 Trial Trans. AM, Testimony of Wilfredo Lopez, pp. 34-35. The enhancement for the victims sustaining injuries, therefore, is amply justified.

Additionally, there is no basis upon which to adjust the defendant's offense level for this group four levels downward on account of his allegedly minimal role. Simply put, counsel offers no evidence to suggest that Defendant Boteo was "plainly less culpable" than his co-conspirators in carrying out this attack. He may not have been the one who first approached the victims, but his role was no different from his fellow gang members once the robbery got underway, and the evidence is at best ambiguous as to whether he actually inflicted blows upon Pedro Lopez. As such, U.S. Probation was correct in not adjusting his offense level.

b)      Kidnapping and Murder of Fire

The second "group" under Count 1 pertains to the kidnapping and murder of Carlos Ramos Martinez, a.k.a., "Fire," a member of a rival faction within 18th Street – *Los Revolucionarios* – which was carried out by members of the Surenos cliques "Tiny Locos Surenos" (TLS) and "Los

Crazy Brothers." (LCB).  At times, Defendant Boteo functioned as the *palabrero*[4] of LCB.  The government agrees with U.S. Probation that the applicable Guideline for this "group" is 2A1.1 for First Degree Murder, *see* PSR ¶ 79, and disagrees with counsel's assertion that the applicable Guideline is § 2A1.2 for Second Degree Murder.  The defendant was involved in the murder by virtue of a series of jail calls between him and co-defendant Carlos Rolando Martinez-Mora in which, the government believes, the evidence shows that Defendant Boteo "greenlit"[5] Fire's murder in retaliation for his meddling in internal LCB affairs. The government acknowledges that the conversations between the defendant and co-efendant Carlos Martinez-Mora is purposefully coded and vague, making it more difficult to discern the defendant's intent.  *See* ECF No. 199. This is deliberately so – as the defendant himself acknowledges when he says that he has "the police on top of me, they will screw me," that is, he is speaking on a recorded jail line from a Maryland correctional institute.  As such, counsel's argument that there is no mention of murder explicitly on the recorded conversations is of little value.  By evaluating the calls *in context*, and with an understanding of the structure and practices of the criminal organization to which both interlocutors belonged, the defendant's intent to have co-defendant Carlos Martinez-Mora carry out the execution of Fire – as opposed to inflicting significant bodily injury on him – can be shown by a preponderance of the evidence.  *See United States v. Harrison*, 356 F. App'x 423, 425 (D.C. Cir. 2009) (finding that a sentence may be based on facts determined by the sentencing judge by a preponderance of the evidence, as long as the sentence is not greater than the statutory maximum.); *United States v. Dorcely*, 454 F.3d 366, 372 (D.C. Cir. 2006); U.S.S.G. § 6A1.3, Commentary ("The Commission believes that use of a preponderance of the evidence standard is appropriate to

---

[4] A *palabrero* is a senior Homeboy and leader who commands a clique and can order gang members to commit acts of violence, including murder, kidnapping, assault, and robbery.

[5] A greenlight is an authorization provided by a *palabrero* within 18th Street to murder another person.

meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.")

First, by way of background, Defendant Boteo had been the *palabrero* for LCB for a number of years prior to his incarceration in 2020 in connection with his arrest and conviction for First Degree Assault. Trial Trans. 4/25/2024 AM, Testimony of Luis Argueta Gomez, pp. 29-30. Nevertheless, as the government established at the trial of the defendant's co-defendants, incarcerated *palabreros* still exert a significant influence over gang operations and provide direction and strategic guidance to homeboys on the ground conducting gang business. *See* Gov. Tr. Ex. JS287-JS333 (July 2021 Snapchat communications between "Crosty," and Gerson Rodriguez, a.k.a., "Demo," an incarcerated *palabrero* in Guatemala). And indeed, 18th Street is a strictly hierarchal organization, such that an older *palabrero* like Defendant Boteo would be shown considerable deference and his views taken as binding. *Cf.* Trial Trans. 4/11/2024 PM, Testimony of Supervisory Special Agent Fernando Benavides III, pp. 30-32. Co-defendant Carlos Martinez-Mora, who initiated the calls, was indeed a *palabrero* of LCB at the time of the calls, but lacked the seniority of Defendant Boteo and would have been in a position to follow Defendant Boteo's orders and heed any guidance he gave closely. Not only was Defendant Boteo more senior than co-defendant Carlos Martinez-Mora, but he would have been exactly the gang member with whom to consult to greenlight a member of 18th Street. In both the U.S. and elsewhere, greenlighting a member of 18th Street is a matter of such gravity that it generally requires approval from the highest levels within the applicable clique structure and there is a specific protocol to it, *see id*. Furthermore, it would have been consistent with historical practice for LCB members like Defendants Boteo and Carlos Martinez-Mora to greenlight a member of the *Revolucionarios*. Indeed, unlike TLS, LCB remained adamantly opposed to the rival *Revolucionarios* and had

10

already greenlit another *Revolucionario,* Ronald Montoya-Pocasangre, a.k.a., "Killer," in the year leading up to the Fire murder given Montoya-Pocasangre's membership in the group.  *See* Tr. Trans. 4/18/2024 PM, Testimony of Ronald Montoya-Pocasangre, at 90:15-25 – 91:1-18.

It is against this backdrop – repeated contacts with perhaps the seniormost clique leader, who is capable of blessing greenlights, about an individual, Fire, who belongs to a rival faction that LCB had been targeting and who had been actively interfering in gang business– that the calls between co-defendant Carlos Martinez-Mora and the defendant occurred.  In the first phone call on July 11, 2021, Gov. Sent. Ex. 1A, upon being told of the issue with Fire, who is referred to as "the *floja*," a derogatory term in Spanish, Defendant Boteo recommended having members of the clique to "fuck" Fire and an unidentified other individual and their mother.[6]  *Id.* at 9.  Defendant Boteo then appeared to suggest doing it at once without thinking about it, and to think of a way to do it.  *Id.*  Later on in the conversation, Defendant Boteo exhorted co-defendant Carlos Martinez-Mora about how "order has to be had."  *Id.* at 10.  When co-defendant Carlos Martinez-Mora responded with "who wants to be living locked up all the time," Defendant Boteo replied "Yes, I know, bro, its's wrong, you understand? But, you know that for the cause, and, and fuck, of always being in, in line, you understand me? Fuck, one has to put their mind to it, do you understand me?" *Id.*

Again, while the wording used is admittedly ambiguous, the notion of doing it at once without thinking of it, and finding a way to do it, is far more consistent with the carrying out of an execution, particularly in the context of an ongoing feud with the *Revolucionarios.*  Furthermore, co-defendant Carlos Martinez-Mora's reply to Defendant Boteo in which he asks who wants to be

---

[6] The Spanish words used –  "les coga verga y que le den su madre" literally translates to fuck them and their mother.  The FBI linguist interpreted this as to fuck them up or to beat them.

incarcerated most of their life, is also strongly suggestive of an actual murder being contemplated, as opposed to an internal gang beating.

In a follow-up call in the early evening of July 12, 2021, the conversation between Defendants Boteo and co-defendant Carlos Martinez-Mora turned ultimately to the "R," referring to the *Revolucionario* Martinez. Gov. Sent. Ex. 2A, at 4. The date of this phone call is important as it occurred on the same date that TLS and LCB clique leaders conducted a meeting at a soccer field in Maryland, at which issues with Fire were raised by co-defendants Carlos Martienz-Mora and Bradley Martinez-Mora. In the July 12, 2021 call, co-defendant Martinez-Mora assures Defendant Boteo that "we are going to do it already, *id.* at 5, and later on adds that "[a]nd I already told him that, that alright, that we're going to fix that like gentlemen, do you understand me? Because we have to deliver it to him there [UI] the evidence. [UI] Those sons of bitches from down there, the ones who gave the word told him a lot of [UI]…" *Id.* After some additional conversation, at the conclusion of the call, Defendant Boteo also uses similar terminology and tells co-defendant Martinez-Mora that the best thing he can do is to "fix" that thing. *Id.* at 8.

In a third and final call the following day – one day after the meeting at the soccer field when Fire attempted to convince co-defendant Carlos Martinez-Mora to allow a fellow clique member – Luis Argueta-Gomez, a.k.a., "Seco," to switch from LCB to TLS – Defendant Boteo gave additional explicit instructions. The conversation initially touches on Argueta-Gomez, who had previously expressed displeasure earlier that month around the Fourth of July at how the clique was being run to Defendant Martinez-Mora and then, with the help of Fire, agitated for a move to TLS. *See* Trial Trans. 4/25/24 AM, Testimony of Luis Argueta-Gomez, at 44:5-10. Defendant Boteo leads with "the first mistake was yours, you get me? Right, for letting it pass. You get me? For giving him wings, do you understand me? Right there at that instant, you understand me?"

Gov. Sent. Ex. 3A, at 5.  He then goes on to say "I would have put, two crazy dudes so that they would smash them all at once, do you understand me? Or I would have smashed him myself, do you understand me? Easily, because man, because look, do you understand me? And look out is fear, do you understand me? All right? The thing is that yes, is not to make him panic, or anything, is just so that he sees that this stuff is not a game, do you understand me? All right?"

Defendant Boteo proceeds to give a lengthy explanation about what must be done both with respect to Fire and Seco, saying:

> Well, when I am crazy like that, right at one, do you understand me? Having two crazy dudes [i.e., Fire and Seco], whether, whether ne-, whether new students or, or old students. Do you understand me? Right, it's a smash, you tell them at once. Right, you know what you have to do then, and, and that you have to go against him with everything and well, right, maybe even touch their faith. Do you understand me? To burst his [Fire's] mouth. Do you understand? The skeleton, so that he sees what the fuck, do you understand? Right. So, at the time that another crazy dude [Luis] sees that, fuck, truth is you can't be disrespectful around here, because as a matter of fact, they will fuck you up higher. Well, right and fuck, the other family, guacha, do you understand? They say, fuck, yeah, they are crazy, they will come down on us with everything."

Gov. Sent. Ex. 3A at 10.  While the phrasing here from Defendant Boteo is deliberately opaque, the most reasonable interpretation is that co-defendant Carlos Martinez-Mora must eliminate Fire and have Seco, the other "crazy dude," witness this so that he understands the price of transgressing gang rules and going against gang leadership.  First, this is essentially exactly how it would play out less than 24 hours after this call, with Seco being forced at gunpoint to execute Fire in the woods along the side of I-95.  Second, here, Defendant Boteo and co-defendant Carlos Martinez-Mora were not talking about any 18th Street member, but a member of the rival *Revolucionarios*, members of which LCB had been actively targeting at this point.  Furthermore, this *Revolucionario* was not simply associating with another clique – as was the case with Ronald Montoya-Pocasangre, whose mere presence in the area was seemingly sufficient to trigger his greenlight – but was actively interfering in internal LCB business and causing dissension within the ranks.

Finally, this call was simply one in a series, in which Defendant Boteo had similarly talked about doing it at once without thinking; "fixing" the situation; and intimated that one had to be willing to spend long periods in jail to bring about the desired order. Again, when taken in context, the calls point squarely toward a pre-meditated murder of a problematic rival as opposed to the administration of some lesser form of punishment.

***

For all the foregoing reasons, the correct Guideline for the second group is 2A1.1 for First Degree Murder, which is 43. Because 43 results in the highest base offense level of the two groups, it represents the combined base offense level, *see* PSR at ¶ 87. Because the first group had a base offense level of 22, 21 levels below the offense level for the second group, there should be no additional units added to the combined base offense level. *See id.* at ¶ 85.

Given that Defendant Boteo accepted responsibility in a timely fashion, he should receive a three-level reduction under § 3E1.1, resulting in a Total Offense Level of 40. *Id.* at ¶ 91.

2. *Criminal History*

The government agrees that the Defendant has accumulated four criminal history points placing him in Criminal History Category III.

| Arrest Date | Charge / Court | Disposition Date / Sentence | Scoring (USSG) |
|---|---|---|---|
| 5/26/2020 | Assault – First Degree Circuit Court for Prince George's County, Upper Marlboro, MD (CT200684X) | 5/26/2021 – Pled Guilty; 20 years imprisonment, 14 years suspended, credit for time served; 5 years Supervised Probation | 3 (§4A1.1(a)) |
| 02/08/2018 | Ct. 1: Assault-Second Degree Ct. 2: Theft-$100 to | 04/19/2018: Pled guilty | 1 (§4A1.1(c)) |

| | Under $1,500 Circuit Court for Montgomery County Rockville, MD (133629C) | Ct. 1- 364 days incarceration, ESS as to all Ct. 2- 6 months incarceration, ESS as to all, 2 years probation, $600 restitution | |
|---|---|---|---|
| | | | **4** |

### 3. USSG Range

Under the Guidelines, at a Total Offense Level of 40, in Criminal History Category III, the defendant's range is 360 months' incarceration to life imprisonment.  However, as the PSR correctly points out, given that the statutorily authorized maximum sentence for this offense is less than the minimum of the applicable guideline range, the guideline sentence is 240 months. USSG §5G1.1(a).

### C.  Sentencing Recommendation

The government recommends that the Court sentence the defendant to the statutory maximum of 240 months' incarceration given the nature and seriousness of his offense; his history and characteristics; and the need for the sentence imposed to satisfy the statutory requirements set forth in § 3553(a)(2)(A)-(D).  The government will discuss each of those factors in turn.

### 1. Nature and Seriousness of the Offense

The defendant is a senior leader and figure of authority within 18th Street and was actively participating in the gang's affairs from his jail cell and ordering the murder of internal dissidents, in the case of Fire.  The government will not belabor how serious a threat the 18th Street gang poses to public safety and how uniquely heinous the kidnapping and murder was of the victim in this case; this Court has obviously had the benefit of presiding over a multi-week, multi-defendant jury

trial as well as the extensive pre-trial litigation that accompanied it.  Put simply, Defendant Boteo was a senior leader of an organization whose *raison d'être* was to inflict violence and terror upon its rivals, associates, wayward members, and innocent civilians to amass further territorial control at the expense of their rivals.  Unlike many racketeering enterprises covered by § 1962(d) which perpetrate violence as an ancillary function to their core business – whether it be trafficking drugs or another racket – 18th Street's core business is violence.  The violence that was ultimately perpetrated on Wilfredo Lopez, Pedro Lopez and, most drastically, Carlos Ramos Martinez, is the very conduct that is specifically encouraged and supported by the gang, and demanded by its members of its leadership, including the defendant.  Indeed, the defendant was not a peripheral figure within 18th Street or a lower-ranking *civil* who needed to do what he was told.  The defendant had ascended to the rank of *palabrero*, sitting at the top of a clique responsible for murders, and shootings as well as firearms and narcotics trafficking.

Furthermore, not even being incarcerated for a violent felony inhibited the defendant from continuing on as a *palabrero* emeritus from the confines of his prison cell nor did it prevent him from wreaking further havoc in the community.  As the exchanges between Defendant Boteo and co-defendant Carlos Martinez-Mora illustrate, Defendant Boteo was routinely counseling his subordinate co-defendant Carlos Martinez-Mora about the necessity of violence and how critical it is to the gang's operations, *See* Gov. Sent. Ex. 3, at 6 ("And you give it to him in the mouth, do you understand me? Because they did that today and tomorrow, they might do something worse, even fire shots at you. Do you understand? Right.") as well as how gang leaders needed to be willing to serve long stints in prison on behalf of the gang "for the cause."  *See* Gov. Sent. Ex. 1, at 10.  Furthermore, throughout the final phone call leading up to the decedent's murder, Defendant Boteo would simply not let co-defendant Carlos Martinez-Mora forget about the necessity of

making a show of force with respect to Fire and Seco, faulting him for his leadership failures and how he could have ever let LCB devolve into infighting.  Ultimately, through his exhortations and haranguing, Defendant Boteo willfully caused the decedent's murder, using co-defendant Martinez-Mora and others as his instruments.  Defendant Boteo did so because he knew it was required to protect and perpetuate the gang he had devoted so much of his life to.  As such, although Defendant Boteo was not there in the early morning hours of July 14, 2021 when 18th Street members murdered Fire, he was in fact responsible for it and his participation, even though limited simply to words, was in fact incredibly serious.

### 2.    Defendant's History and Characteristics

First and foremost, the defendant's most pertinent history and characteristics stem from his leadership of the LCB clique in Maryland, and his continued service to 18th Street even after his incarceration.  While the defendant claims that he "ended up" "having" to associate with the gang after he illegally immigrated to the United States and had wanted to disassociate with the enterprise, *see* PSR at ¶ 113, he "ended up" ascending the leadership ranks within the organization and participating in various criminal activities on its behalf.  Not even being incarcerated for years at a time for a felony conviction was sufficient to deter the defendant's desire to continue to lead the gang from his jail cell.

Furthermore, the defendant has managed to accumulate multiple criminal convictions separate and apart from his life in 18th Street.  Even before the events giving rise to this case, in February 2018, the defendant participated in a robbery of an innocent bystander in which he, along with five other individuals, demanded a cigarette, struck him, and ended up taking his cellphone. *See id. at* ¶ 93.  And indeed, despite admitting to committing this robbery, the defendant was only required to plead to a second degree assault and theft charge, as opposed to the most serious,

readily provable offense and received a fully suspended sentence.  *Id.*  His conviction did little to deter his criminal behavior, whether as part of 18th Street or in his private life.  Indeed, three years later, at the time he was communicating with co-defendant Carlos Martinez-Mora regarding Fire, Defendant Boteo was already serving a carceral sentence at the Jessup Correctional Institute for First Degree Assault.  This conviction stemmed from a May 2020 confrontation between the defendant and his mother and brother.  In short, during a domestic dispute, the defendant began confronting his mother with a firearm and pointing at her repeatedly during an argument in their home, while pointing it in the air and then threatening his brother with a bottle.  *See id.* at ¶ 94. While the defendant received a more significant sentence – approximately 6 years' incarceration – again, it did little to deter him from continuing to participate in criminal conduct, as this case itself shows.

### 3.     *Need for the Sentence Imposed*

The government believes that its proposed sentence of 240 months' incarceration[7] will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant with training, treatment, and other type of care he may require.  Here, the defendant is the leader of a transnational criminal street gang which is devoted to perpetrating violence against all threats – be they external, such as MS-13, or internal, including dissident 18th Street members.  As part of his duties as a senior gang leader, he

---

[7] The government is not recommending a period of supervised release because the defendant is an illegal alien and will likely be deported upon completion of his carceral sentence.  *See* 5D1.1(c) (" The court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment.")  18 U.S.C. § 1963 does not specify a mandatory term of supervised release for violations of § 1962.

continued to exert control over his clique, counseling the leaders on the ground, such as co-defendant Carlos Martinez-Mora as to what to do, and ultimately greenlit the execution of the member of a rival faction.  Defendant Boteo's setting in motion of Fire's murder from his prison cell to protect his clique and his 18th Street faction warrants severe punishment, even if Defendant Boteo did not personally participate in the other acts preceding Fire's murder.  A statutory maximum sentence of 240 months' incarceration would not only reflect the seriousness of Defendant Boteo's criminal conduct, but would also serve as a deterrent, both specifically to the defendant, but also to similarly situated gang members currently in the community.  Such a sentence demonstrates the inordinately high cost of involving oneself in a criminal enterprise that is seemingly single-mindedly devoted to violence and control and that even those who do not pull the proverbial trigger will receive harsh sentences.

## III.    CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should sentence the defendant to a total of 240 months' incarceration.  Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    /s/ *Will Hart*_____
WILL HART
JOHN F. KORBA
SITARA WITANACHCHI
Assistant United States Attorneys
U.S. Attorney's Office for the
District   of Columbia

D.C. Bar No. 1029325 (Hart)
D.C. Bar No. 1010303 (Korba)
D.C. Bar No. 1023007 (Witanachchi)
601 D. St., N.W.,
Washington, D.C. 20530